IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANIS SHAIKH,<br><br>    Plaintiff,<br><br>    v.<br><br>AETNA LIFE INSURANCE COMPANY,<br><br>    Defendant. | Case No. 18-cv-04394-MMC<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT; DENYING DEFENDANT'S CROSS-MOTION FOR JUDGMENT; FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Re: Doc. Nos. 37, 38 |

Before the Court are (1) plaintiff Anis Shaikh's ("Shaikh") "Motion for Judgment," filed August 16, 2019, and (2) defendant Aetna Life Insurance Company's ("Aetna") "Cross-Motion Under FRCP 52," filed September 6, 2019. The motions have been fully briefed. Having read and considered the parties' respective arguments as well as the applicable administrative record, the Court rules as follows.[1]

## BACKGROUND[2]

Shaikh was formerly employed as a Senior Manufacturing Test Development Engineer with Zonare Medical Systems, Inc. ("Zonare"), a company that develops and manufactures medical ultrasound imaging systems. (See Administrative Record ("AR") 413-14).[3] Through his employer, Shaikh was a participant in a "Group Plan," issued by Aetna, that provides for payments to participants who become disabled within the

---

[1] By order filed October 21, 2019, the Court took the matters under submission.

[2] This section and the following sections constitute the Court's findings of fact and conclusions of law. See Fed. R. Civ. P. 52(a)(1).

[3] The Administrative Record was filed September 16, 2019 as Exhibit A to the Supplemental Declaration of Rebecca A. Hull.

1  meaning of the policy. (AR 1-37). On January 11, 2016, Shaikh's car "inexplicably went
2  off [an exit] ramp and rolled over downwards 20 feet," resulting in a "left nondisplaced
3  clavicle fracture." (AR 164). On January 20, 2016, Shaikh had surgery, namely, a "[l]eft
4  clavicle open reduction and internal fixation with demineralized bone matrix
5  augmentation," to repair the fracture. (AR 146). On February 3, 2016, Shaikh submitted
6  to Aetna a claim for disability benefits, in which he listed January 8, 2016 as his last day
7  of work (AR 534), and stated he was unable to return to work due to "[s]evere pain"
8  (AR 540) in his "neck, shoulder and arm" (AR 323).

9  Aetna initially paid Shaikh "Short Term Disability (STD)" benefits for approximately
10 three months, from January 18, 2016 to April 10, 2016 (AR 437), and then paid "Long
11 Term Disability (LTD)" benefits for approximately eleven months, from April 10, 2016
12 (AR 485), to March 16, 2017, on which date his benefits were terminated (AR 517).
13 Shaikh appealed the termination, and, on May 25, 2017, his appeal was denied.
14 (AR 529).

15 Subsequently, on July 6, 2017, Shaikh filed with the Social Security Administration
16 ("SSA") an application for disability benefits. On October 31, 2017, the SSA granted
17 Shaikh's application, finding he "became disabled under [its] rules on January 8, 2016."
18 (AR 302).[4]

19 Thereafter, on July 19, 2018, Shaikh filed the instant action pursuant to the
20 Employee Retirement Income Security Act ("ERISA"), seeking judicial review of the
21 denial of his claim for LTD benefits and requesting an award of such benefits along with
22 "such other relief as the Court deems equitable and just." (See Compl. at 14:1-3,14:9).

## LEGAL STANDARD

24 Under ERISA, a plan participant may bring a civil action "to recover benefits due to
25 him under the terms of his plan," see 29 U.S.C. § 1132(a)(1)(B), in which action the

---

[4] The record contains the SSA's award letter but not the administrative record on which its decision was based.

2

plaintiff has the burden to establish his entitlement to benefits, see Muniz v. Amec Construction Management, Inc., 623 F.3d 1290, 1294 (9th Cir. 2010).

Where, as here, a court's review of a decision to deny benefits is de novo,[5] disputes of fact are "resolved by trial." See Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094 (9th Cir.), cert. denied, 528 U.S. 964 (1999). "Although Rule 43(a) requires that 'testimony' be taken in open court, the record [in an ERISA case] should be regarded as being in the nature of exhibits, which are routinely a basis for findings of fact even though no one reads them out loud." Id. Specifically, the district court tries the case "on the record that the administrator had before it." Id. at 1095. "In a trial on the record, . . . the judge can evaluate the persuasiveness of conflicting [evidence] and decide which is more likely true." Id. In so doing, the district court "consider[s] anew both the legal and factual aspects of [the plaintiff's] claim." See Thomas v. Oregon Fruit Products Co., 228 F.3d 991, 995 (9th Cir. 2000). In other words, the district court "does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." See Muniz, 623 F.3d at 1295-96.

## DISCUSSION

In his motion for judgment, Shaikh states he seeks "an award of all disability benefits owed through the date of judgment, pre-judgment interest on his awarded disability benefits, and a declaration that he is entitled to benefits on an on-going basis." (See Mot. at 4:21-23).

The Group Plan, i.e., the plan that sets forth the circumstances under which a plan participant is entitled to LTD benefits, provides the following "Test of Disability":

> From the date that you first become disabled and until Monthly Benefits are payable for 24 months, you will be deemed to be totally disabled on any day if, as a result of a disease or injury, you are unable to perform with reasonable continuity the substantial and material acts necessary to pursue

---

[5] On October 22, 2018, the parties stipulated the appropriate standard of review is de novo.

3

your own occupation and you are not working in your own occupation.

After the first 24 months that any Monthly Benefit is payable during a period of disability, you will be deemed to be totally disabled on any day if, as a result of a disease or injury, you are not able to engage with reasonable continuity in any occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, and physical and mental capacity that exists within any of the following locations:

- a reasonable distance or travel time from your residence in light of the commuting practices of your community; or
- a distance or travel time equivalent to the distance or travel time you traveled to work before becoming disabled; or
- the regional labor market, if you reside or resided prior to becoming disabled in a metropolitan area.

(AR 31).

Aetna argues that, "although [Shaikh] reported subjective symptoms," the medical records "reflected steady improvement in his actual physical condition during the eleven months he received LTD benefits" and, by March 2017, "no longer supported functional limitations of such severity as to preclude him from sedentary work in his Own Occupation." (See Cross-Mot. at 5:15-20).

In support of its argument, Aetna relies primarily on the results of two diagnostic tests pertaining to Shaikh's shoulder. In particular, on October 17, 2016, neurologist Prabhjot Singh Khalsa, M.D. ("Dr. Khalsa"), performed "electrodiagnostic studies" based on "clinical suspicion of a brachial plexopathy" (AR 362), and found such "studies . . . failed to document any abnormalities to confirm the diagnosis of brachial plexopathy." (AR 365).[6] Thereafter, on March 7, 2017, radiologist Karim Taghaddos, M.D., performed an "MRI Left Shoulder" and found "[m]inimal degenerative changes at the [acromioclavicular] joint" along with a "5 mm bone spur" at the acromion,"[7] and a "[v]ery

---

[6] Brachial plexopathy "occurs when there is damage to the brachial plexus[,] . . . an area on each side of the neck where nerve roots from the spinal cord split into each arm's nerves," which damage "results in pain, decreased movement, or decreased sensation in the arm and shoulder." See Brachial plexopathy, MEDLINEPLUS, https://medlineplus.gov/ency/article/001418.htm (last visited Mar. 24, 2020).

[7] The acromioclavicular joint "is the point where the . . . clavicle meets the acromion, which is the tip of the shoulder blade." See Shoulder Osteoarthritis (Degenerative Arthritis of the Shoulder), WEBMD, https://www.webmd.com/osteoarthritis/shoulder-osteoarthritis-degenerative-arthritis-

4

small interstitial tear at the footprint of infraspinatus."[8] (AR 331-32).

The Court finds Aetna has focused overly on the objective evidence. First, as Dr. Khalsa himself reported, "nerve conduction and electromyography studies may be normal in mild brachial plexopathy" (AR 365), and, as noted above, brachial plexopathy is a disorder occurring where there is nerve damage.

Moreover, with respect to Shaikh's cervical spine, X-rays and an MRI did show structural changes, including "posterior spondylosis" (AR 394)[9] and "[s]ignificant . . . neuroforaminal narrowing" (AR 329).[10] Although Aetna argues Shaikh's "treating doctors . . . did not attribute Shaikh's reported symptoms to cervical spine issues" (see Cross-Mot. at 9:21-22), Shaikh's primary care physician and specialist in internal medicine, Karim Hussain, M.D. ("Dr. Hussain"), appears to have done so. (See AR 335) ("Capabilities and Limitations Worksheet" dated March 7, 2017, grouping together shoulder and cervical conditions).

Lastly, and of particular importance, Aetna has essentially disregarded Shaikh's complaints of severe pain, which, as set forth below, have persisted over an extended period of time. See, e.g., Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 872 n.3 (9th Cir. 2008) (noting "the factual observation that disabling pain

---

shoulder#1 (last visited Mar. 24, 2020). Degenerative joint disease is commonly found at the acromioclavicular joint and "occurs when the cartilage that covers the tops of bones . . . degenerates or wears down[;] [t]his causes swelling, pain, and sometimes the development of . . . bone spurs." See id.

[8] The infraspinatus covers the back of the shoulder blade and "is the main muscle responsible for lateral rotation of [the] arm away from the centerline of [the] body." See Rotator Cuff Anatomy Explained, HEALTHLINE, https://www.healthline.com/health/bone-health/rotator-cuff-anatomy (last visited Mar. 24, 2020).

[9] "Cervical spondylosis is the degeneration of the bones and disks in the neck, which can lead to a variety of problems[.]" See Cervical spondylosis, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/cervical-spondylosis (last visited Mar. 24, 2020).

[10] Neural foraminal stenosis, or narrowing, is a condition wherein "[t]he nerve roots that exit the spinal column . . . become compressed," which may cause "neck pain" and "shooting pain going down the arm." See Neural Foraminal Stenosis, HEALTHLINE, https://www.healthline.com/health/neural-foraminal-stenosis (last visited Mar. 24, 2020).

5

cannot always be measured objectively . . . is as true for ERISA beneficiaries as it is for Social Security claimants").

On March 3, 2016, orthopedic surgeon Soheil Motamed, M.D. ("Dr. Motamed"), while noting "the fracture appear[ed] to be healing well," further noted Shaikh "continue[d] complaining of left shoulder and left arm pain," for which Dr. Motamed prescribed Percocet, an opioid pain medication. (AR 143). Thereafter, as set forth below, four additional treating physicians, specifically, another orthopedic surgeon, a family physician, a neurologist, and an internist, recorded Shaikh's use of various types of prescription pain medications, the most successful of which only partly alleviated Shaikh's pain.

First, on April 4, 2016, orthopedic surgeon Co Banh, M.D. ("Dr. Banh") noted Shaikh had been using Percocet and Norco, another opioid pain medication, yet "continued to have severe pain in the left upper shoulder with radiation down the left arm," which Shaikh rated 9/10 on a numeric scale. (AR 393). Dr. Banh prescribed Naprosyn, an anti-inflammatory drug. (AR 395). Thereafter, on May 26, 2016, family physician Dr. Khalid Baig, M.D. ("Dr. Baig"), while noting Shaikh had switched from opioid pain medication to Naprosyn and that his pain was "now down to scale 5" (AR 387), advised against the use of such medication "due to renal function compromise" (AR 389). Although, as Aetna points out, Dr. Baig, on July 12, 2016, under "Subjective Complaints," noted "[a] little pain on [left] shoulder" (AR 383), Dr. Khalsa, on September 8, 2016, noted Shaikh's complaint of "[m]oderate to severe" pain that was "[s]harp and prickling" and of "[i]ntermittent to constant" duration (AR 359), for which Dr. Khalsa prescribed Gabapentin, a non-opioid pain medication (AR 360). On November 3, 2016, Dr. Baig, in the most recent treating physician's note contained in the administrative record, reported Shaikh's pain had been reduced with his use of Gabapentin, but was still "at 5-6," i.e., still ranging from moderate to severe. (AR 352).[11] Lastly, Dr. Hussain, in the "Capabilities

---

[11] In December 2016 and January 2017, Shaikh received physical therapy (AR 346-48); the record, however, does not suggest his pain was reduced further during such

6

and Limitations Worksheet" referenced earlier herein, noted Shaikh was still using Gabapentin in March 2017. (AR 335).

Additionally, Shaikh has repeatedly complained that, as a result of pain, he has difficulty lifting items. On July 25, 2016, in a "LTD Claimant Interview" with Aetna, Shaikh reported he experienced "a lot of pain" when "lifting objects in certain positions," which pain he described as "shooting and sometimes pinching." (AR 657). On September 30, 2016, in another "LTD Claimant Interview," Shaikh reported he was still "having pain in his shoulder" and was "unable to reach behind him or to lift anything over a couple of pounds." (AR 667-68). On May 2, 2017, in an "Appeal Request Form" provided by Aetna, Shaikh reported he was unable to "move[ ] heavy equipment due to pain & weakness in neck, shoulder & arm." (AR 324).

Moreover, in other forms provided by Aetna, Shaikh's treating physicians opined that he could only lift items weighing no more than five pounds. On March 3, 2016, for example, Dr. Motamed, Shaikh's orthopedic surgeon, opined that Shaikh could "no[t] lift . . . greater than 2 lbs." (AR 138). Thereafter, on May 26, 2016, Dr. Baig, Shaikh's family physician, noting Shaikh's "severe left shoulder pain" (AR 398), opined Shaikh could "[o]ccasional[ly]" lift a "[m]aximum weight" of "1-5 lbs." (AR 399). Lastly, on March 7, 2017, Dr. Hussain, Shaikh's primary care physician, similarly opined Shaikh could "[o]ccasional[ly]" lift a "[m]aximum weight" of "1-5 lbs.," and further specified the duration of such restriction was "one year" (AR 335).

Aetna, relying on a "Physician Review," dated May 8, 2017, and prepared by occupational medicine specialist Timothy Craven, M.D., M.P.H. ("Dr. Craven") (AR 315), contends Shaikh is not limited to the above-described extent. Dr. Craven, at the request of Aetna, reviewed Shaikh's medical records and consulted with Dr. Hussain. (AR 318). Based on the medical records, Dr. Craven opined that from November 3, 2016, through March 7, 2017, Shaikh could "lift[ ]" items weighing "up to 20 lbs[.]," and, that, after March

---

period.

7

7, 2017, "[t]here was no support in [Shaikh's] medical records for a functional impairment." (AR 318-19). As to the period ending March 7, 2017, Dr. Craven offered no explanation as to why he disagreed with Dr. Hussain, in whose opinion, as noted, Shaikh could only lift items weighing far less than 20 pounds, nor did he elaborate as to his conclusion that no restriction for the period after March 7, 2017, was necessary.

For purposes of ERISA, although the opinion of a treating physician "gets no special weight," see Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 879 (9th Cir. 2004), the district court may "take cognizance of the fact (if it is a fact in a particular case) that a given treating physician has a greater opportunity to know and observe the patient than a physician retained by the plan administrator," see Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) (internal quotation and citation omitted).

As Shaikh's treating physicians had a greater opportunity to know and observe him than Aetna's retained physician, Dr. Craven, they had a greater opportunity to assess his credibility, and one would expect any doubts as to whether Shaikh in fact suffered the pain he alleged, or the effect thereof, would be reflected in the medical records. Nothing in those records suggests any treating physician ever questioned the effect of Shaikh's pain. To the contrary, over an extended period of time, each physician who examined Shaikh, and who opined as to his lifting capabilities, agreed he could only lift items weighing no more than five pounds. (AR 138, 335, 398). Dr. Craven did not examine Shaikh, although, under the terms of the Group Plan, he could have done so (see AR 22) (providing Aetna "ha[s] the right and opportunity to examine and evaluate any person who is the basis of any claim at all reasonable times while that claim is pending or payable"), and, indeed, Dr. Craven does not opine, nor does Aetna argue, Shaikh is malingering.

Accordingly, the Court finds Shaikh could lift items weighing no more than five pounds.

The Court next considers whether, as a result of such functional limitation, Shaikh,

8

for the remainder of the twenty-four month "Own Occupation" period following Aetna's termination of benefits, i.e., from March 16, 2017, through April 10, 2018, was unable to perform "the substantial and material acts" of his "own occupation." (AR 31).

Shaikh's position as a Senior Manufacturing Test Development Engineer at Zonare entailed his "designing, building, and programming automated test fixtures . . . to validate medical ultrasound imaging systems." (AR 413). On April 10, 2017, Shaikh submitted to Aetna a letter from Zonare's "Manager of Human Resources," stating "he was required to frequently lift pans weighing up to 51 lbs." (AR 327).[12] Thereafter, on April 19, 2017, at Aetna's request, a vocational rehabilitation counselor performed an "Occupation Analysis," and found Shaikh's position, as performed in the national economy, correlated with the "Light" strength occupation of "Electronics Test Engineer" and also with the "Sedentary" strength occupation of "Software Engineer." (AR 724-25). Although Aetna initially determined the former more accurately represented Shaikh's position (AR 721), Aetna, as noted, now argues Shaikh's position correlates with a "Sedentary" strength occupation (see Cross-Mot. at 5:20).

According to the Department of Labor, "Electronics Test Engineer" requires "[e]xerting up to 20 pounds of force occasionally," see Dict. of Occ. Titles (4th ed. 1991) § 003.061-034, and "Software Engineer" requires "[e]xerting up to 10 pounds of force occasionally," see id. § 030.062-010. As Shaikh could only lift items weighing no more than five pounds, the Court finds Shaikh has shown he was unable to perform "the substantial and material acts" of his "own occupation."

The Court now turns to whether Shaikh is entitled to an award of benefits. "[A] plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts." Grosz–Salomon v. Paul Revere Life Ins. Co., 237 F.3d

---

[12] Although Aetna now contends "there is serious doubt that Shaikh's former job ever actually included a requirement that he must be able to lift more than 50 pounds" (see Cross-Mot at 14:2-3), Aetna, in various notes in its claim file, conceded Shaikh's position "involve[d] . . . lifting up to 50 pounds" (AR 107, 108, 124).

9

1154, 1164 (9th Cir.2001) (affirming district court's award of benefits and denial of request to remand for determination thereof where plan administrator "applied the right standard, but came to the wrong conclusion"); cf. Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan, 85 F.3d 455, 460 (9th Cir.1996) (remanding for determination on merits where plan administrator "ha[d] not yet had the opportunity of applying the [p]lan, properly construed").

Accordingly, the Court finds it appropriate to award benefits corresponding to the remainder of the twenty-four month "Own Occupation" period.

The Court next addresses Shaikh's claim for LTD benefits under the "Any Occupation" provision of the Group Plan. (AR 31).

Where, as here, a court has found a plan administrator erred in determining a claimant is unable to perform his "own occupation," district courts commonly have found it appropriate to remand the matter to the plan administrator to determine whether the claimant is entitled to benefits under an "any occupation" provision. See Lavino v. Metropolitan Life Ins. Co., 2010 WL 234817, at *13 (C.D. Cal. January 13, 2010) (holding, where plan administrator erroneously terminates LTD benefits under an "own occupation" provision, "[r]emand is proper" for determination of whether claimant satisfies an "any-occupation standard" in plan); Minton v. Deloitte & Touche USA LLP Plan, 631 F. Supp. 2d 1213, 1221 (N.D. Cal. 2009) (holding, where plan administrator erroneously finds claimant ineligible for LTD benefits under an "own occupation" provision, claimant's claim for benefits under an "any occupation" provision is properly remanded to plan administrator for consideration).

Similarly, in this instance, the Court finds it appropriate to remand the matter to Aetna for a determination of whether Shaikh can demonstrate he is entitled to LTD benefits under the "Any Occupation" provision, particularly given the absence, both in the record presented to Aetna and the record before the Court, of any medical evaluation

later than March 7, 2017.[13]

Lastly, the Court addresses Shaikh's claim, made in his complaint and reiterated in his motion for judgment, that he is entitled to an award of prejudgment interest. In his motion, Shaikh does not set forth any argument as to why he is entitled to such award. Under the circumstances, the Court makes no determination at this time as to Shaikh's entitlement, if any, to an award of prejudgment interest.

## CONCLUSION

For the reasons stated above:

1. Shaikh's motion for judgment is hereby GRANTED, and the matter is REMANDED to Aetna to (a) determine the amount of LTD benefits to which Shaikh is entitled under the "Own Occupation" provision of the Group Plan, from March 16, 2017, through April 10, 2018, and (b) consider whether Shaikh is entitled to benefits under the "Any Occupation" provision of the Group Plan.

2. Aetna's cross-motion for judgment is hereby DENIED.

**IT IS SO ORDERED.**

Dated: March 24, 2020

MAXINE M. CHESNEY
United States District Judge

---

[13] Shaikh argues the SSA's award letter "is evidence of his disability from any occupation under the [Group] Plan's definition." (See Pl.'s Reply at 21:23-25). Although "not bind[ing] on plan administrators," SSA awards "are evidence of disability." See Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 679 (9th Cir. 2011). Here, however, the letter was not available at the time Aetna made its decision.

11